IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned May 15, 2013

**IN THE MATTER OF: CANDELARIA M.**

**Appeal from the Juvenile Court for Putnam County**
**No. 1169TPR      John P. Hudson, Judge**

**No. M2012-02675-COA-R3-PT - Filed June 25, 2013**

Mother's parental rights to her child were terminated due to her diminished mental capacity, which caused her to be incompetent to care for her child. Mother appealed, and we affirm the trial court's judgment. The trial court's findings are supported by clear and convincing evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK CLEMENT, JR. and Andy D. Bennett, JJ., joined.

Kelsy Austin Miller, Cookeville, Tennessee, for the appellant, A.P.M.

Robert E. Cooper, Jr., Attorney General and Reporter, Jordan Scott, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I. BACKGROUND**

This case involves the termination of A.P.M.'s ("Mother's") parental rights to her daughter, C.P.M. ("Child").[1] Child was born prematurely in July 2011 and was placed in foster care the following month, before she left the hospital, because the Department of Children's Services ("DCS") was concerned Mother was not competent to care for Child due to Mother's mental deficiencies. The trial court later entered an Adjudicatory and Dispositional Hearing Order in which it determined that Child was dependent and neglected because by the time Child was ready to leave the hospital Mother "had not gained and

---

[1]The identity of Child's father is unknown.

demonstrated care giving techniques needed to provide [for] the baby such as changing the diaper, maintaining body temperature, and keeping a good heart rate," despite the hospital staff's attempts to teach her.

A Guardian ad Litem ("GAL") was appointed to represent Child's interest and filed a petition in March 2012 to terminate Mother's parental rights.[2] The GAL cited Mother's incompetency to parent as the reason for his petition. The trial court held a termination hearing in November 2012 and determined that the GAL had proven by clear and convincing evidence both grounds for termination and that termination of Mother's parental rights is in Child's best interest. The court entered a Final Decree of Guardianship in which it ordered, adjudged, and decreed the following:

> That the Respondent, A.P.M. is incompetent to parent C.P.M.; there is little likelihood that these conditions will be remedied at an early date so that the child could be returned to the Respondent in the near future; that the continuation of the parent/child relationship greatly diminishes the child's chances of early integration into a stable and permanent home; and that it is in the best interest of the child that all the parental rights of said Respondent to said child be forever terminated; and that the complete custody, control, and guardianship of said child be awarded to the State of Tennessee, Department of Children's Services, with the right to place said child for adoption and to consent to said adoption in <u>loco parentis</u>.

Mother appeals from the trial court's judgment and contends the trial court erred in the following ways: (1) finding there was clear and convincing evidence that Mother was mentally incompetent such that her parental rights should be terminated; (2) finding there was clear and convincing evidence that terminating Mother's rights is in Child's best interest; (3) determining that DCS provided reasonable efforts to find a suitable placement for Child if Mother's rights are terminated; and (4) denying Mother's motion to change Child's placement to maintain her family unit.

## II. STANDARD OF REVIEW

This appeal involves one of the most serious decisions courts make. "Few consequences of judicial action are so grave as the severance of natural family ties." *M. L. B. v. S. L. J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)). Terminating parental rights has the legal effect of reducing the parent to the role of

---

[2]A child's guardian ad litem has standing to file a petition to terminate a parent's parental rights. Tenn. Code Ann. § 36-1-113(b).

a complete stranger, and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(*l*)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). While this right is fundamental, it is not absolute. The state may interfere with parental rights, through judicial action, in some limited circumstances. *Santosky*, 455 U.S. at 747; *In re Angela E.*, 303 S.W.3d at 250.

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

An individual seeking to terminate another's parental rights must prove two things. Tennessee Code Annotated § 36–1–113(c) requires that termination of parental rights must be based upon: (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental rights have been established; and (2) that termination of the parent's rights is in the best interests of the child.

Both grounds and best interests must be proved by clear and convincing evidence. *In re Angela E.*, 303 S.W.3d at 250 ; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). This heightened burden of proof is one of the safeguards required by the fundamental rights involved, *Santosky*, 455 U.S. at 769, and its purpose is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re Angela E.*, 303 S.W.3d at 250; *In re M.W.A.*, 980 S.W.2d at 622.

> Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.*, 319 S.W.3d at 596.

In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

The party seeking termination must establish the existence of only one statutory ground to support a termination. *In re Angela E.*, 303 S.W.3d at 251; *In re Valentine*, 79 S.W.3d at 546. Only if at least one ground is established by clear and convincing evidence does the trial court or the reviewing court conduct a best interests analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. As we have stated before, existence of a ground does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child. *In re C.B.W.*, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

Appellate courts review the trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Thus, reviewing courts will review the trial court's findings of fact *de novo* on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H.*, 215 S.W.3d 793, 809 (Tenn.2007).

In light of the heightened burden of proof in termination proceedings, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements necessary to terminate a parent's rights. *In re Bernard T.*, 319 S.W.3d at 597. A reviewing court must review "the trial court's ruling that the facts of [a] case sufficiently support the termination ground. . . ," a conclusion of law, *de novo* with no presumption of correctness. *In the Matter of M.L.P.*, 281 S.W.3d at 393 (quoting *In re A.M.H.*, 215 S.W.3d at 810).

As in all other cases, questions of law, including issues of statutory interpretation, are reviewed *de novo* with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246; *Adoption of A.M.H.*, 215 S.W.3d at 809.

### III. EVIDENCE OF MOTHER'S MENTAL CAPACITY

Evidence introduced at trial showed that Child was born three weeks prematurely and spent the first few weeks of her life in the hospital. Nurses at the hospital were concerned Mother would be unable to care for Child properly on her own once Child was released. The nurses noted Mother could not tell time, she was unable to keep up with Child's feeding schedule, she did not know the date of Child's birth, and she refused to wake Child up for feedings despite the nurses' explanations of why this was important. Mother had to be reminded several times how to hold Child, and Mother was reluctant to change Child's diaper.

In response to a request by DCS that an evaluation be conducted to assess Mother's mental condition as it relates to parenting, a psychologist performed an evaluation of Mother in December 2011, when Child was four months old. The psychologist testified that Mother has an IQ of 50, which is in the lowest 0.1 percentile, and places Mother in the range of "extremely low intelligence." The psychologist did not believe Mother was equipped to parent Child by herself, explaining:

> [T]here is a concern that she . . . wouldn't be able to adequately assess medical needs the child might have and might be too casual in dealing with that medical need, such as a high fever the child was running and the types of things she would need to do to decrease that high fever to possibly taking the child to an emergency room. . . . For example, if the child choked on something . . . and it could not be immediately identified as to what object was causing the choking or what . . . was involved in the choking of the child, it is quite likely that [Mother] would actually either become too anxious to handle it or possibly not notice it and then it could be dangerous to the child.

In his written evaluation of Mother, the psychologist opined that "[Mother] does <u>not</u> meet the requirements for competency to parent." In support of this opinion, the psychologist wrote:

> [Mother] reads and spells at the first grade level. She cannot tell time. . . . When presented with the scenario in which her child had a dangerous sharp object, she stated she would get help and only after two or three hints from the evaluator she stated she would take the object away from her child. . . . In the scenario of her child crying a lot and refusing to eat and refusing her bottle, her solution was to take her to the doctor or emergency room. In the scenario when her daughter was vomiting and had diarrhea she stated she would check her again in the morning. . . . When asked what she would do in the case of an emergency she stated she would go to the doctor. She was then asked about emergency procedures if her child needed quick attention and she did not

know those procedures or the emergency number.

. . . . .

[Mother] has only a limited ability to count. She cannot and does not make change at the grocery store and does not do her own shopping. She does not know how to plan a balanced meal for an adult or a child. She cannot tell time and depends on a time display on her phone to tell her the time. She will have a real problem if she is caring for a baby and her phone loses power. Such a situation would cause harm to the child, failure to make an important appointment with a doctor, failure to provide medication at the appropriate time or failure to give the medication at all on a given day.

[Mother] cannot read and will not be able to independently administer medication. At best medication will have to be prepared prior to the administration and be in dose containers designated by time and an easy to use symbol such as a color.

When asked whether Mother could be taught the things she did not then understand about raising a child, the psychologist responded:

I've worked with persons of extremely low intelligence and have done counseling with them, too, in the settings where a person of extremely low intelligence is in a small unit . . . and those persons need 24-hour supervision and care where they are taught to do things. But they're taught and re-taught and re-taught and sometimes they accomplish those things and sometimes they don't and they have to - - and, of course, there's someone there. But with [Mother], in my view, based on the . . . testing, as well as her ability to have knowledge and information, [she] would not be able to acquire sufficient information to individually parent this child.

Live testimony at trial was provided by Maggie Lundholm, who was a family service worker employed by DCS. Ms. Lundholm testified that DCS has provided therapeutic visitation with Mother and Child and that Ms. Lundholm has observed Mother's interactions with Child on numerous occasions. Ms. Lundhold acknowledged that Mother has formed a bond with Child but that Child is anxious before and during her visits with Mother.[3] When Ms. Lundholm observed visits between Mother and Child, Mother's mother and siblings

_____

[3]For at least part of the time Child has been in foster care she has spent two hours of supervised visits with Mother every other week.

were usually with Mother and helped her interact appropriately with Child. When asked whether she believed Mother would be able to provide safe care for Child on her own, Ms. Lundhold replied "No."

Carla Ellison, who was a case manager for Kids First, also testified at trial. Kids First was asked by DCS to provide Mother with parenting education and training. Ms. Ellison met with Mother a total of nine times in 2012 from late March through May and covered areas such as how to prepare formula properly, how to change a diaper, what to do in an emergency, and first aid issues. Ms. Ellis testified that Mother was eager to learn and be the best parent she could be to Child, but acknowledged that Mother's limitations prevented her from taking care of Child on her own. For example, Ms. Ellis testified Mother could not follow instructions on a box of medicine without asking for help from someone else.

Melissa Parks, a court appointed special advocate, also testified at trial. Ms. Parks observed Mother interacting with Child seven or eight times and testified that she noticed only a "slight improvement" in Mother's interactions with Child as a result of the parenting education she was provided.

## IV. TERMINATION OF MOTHER'S RIGHTS

### A. Grounds for Termination

A parent's rights may be terminated on the ground of mental incapacity if a court determines the following by clear and convincing evidence:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child.

Tenn. Code Ann. § 36-1-113(g)(8)(B). As the statute provides, the GAL seeking termination of Mother's rights must prove (1) that Mother is presently unable to care for Child and (2) that it is unlikely she will be able to assume care of and responsibility for Child in the near future. *In re Keisheal N.E.*, 2010 WL 2176104, at *7 (Tenn. Ct. App. May 28, 2010).

The trial court relied on the following facts, *inter alia*, in determining that the GAL had proved by clear and convincing evidence grounds for terminating Mother's parental rights: (1) Mother's inability to care for Child while Child was in the hospital during the first three weeks of her life, despite attempts by nurses to teach Mother and (2) the psychologist's deposition testimony and written evaluation concluding that due to Mother's mental limitations, she is not equipped to parent Child competently. According to the psychologist, Mother has mental deficits in academic skills needed for daily independent functioning. She also has deficits in self-direction, including skills needed for independence, responsibility, and self-control in making choices, following directions, and completing tasks.

Mother argues that she was nervous when the psychologist was interviewing her and that she knows more about how to parent Child than she is able to verbalize. Mother argues the GAL filed the petition to terminate her rights prematurely and that Mother was making progress through the educational training provided by Kids First in learning how to parent more effectively.

This is a difficult case because Mother loves her child and wants to parent her. Nevertheless, the evidence is clear and convincing that Mother is incompetent to provide adequately for Child's care and supervision due to her mental limitations and that it is unlikely Mother will be able to assume the care of and responsibility for Child in the future. When the psychologist was asked whether he thought Mother was capable of becoming a competent parent in the future, he responded that he believed it would take three to five years for Mother to become competent enough, and he could not be certain she could become competent within that time.[4]

Even if Mother were able to master some of the skills needed to care for Child, there is still the problem that Mother is unable to shop by herself, prepare balanced meals, or read labels on medicine bottles or boxes to know how to administer the correct dosage of medicine. Evidence showed she does not know how to recognize what constitutes an emergency or how to respond appropriately in the case of an emergency. Moreover, Child's needs will change as she grows, and no evidence was introduced to suggest Mother would be able to adjust her parenting to respond adequately to Child's changing needs.[5]

---

[4]The Court of Appeals has determined that two years does not constitute the "near future" when determining, for purposes of Tenn. Code Ann. § 36-1-113(g)(8)(B)(i), whether it is likely that a parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future. *In re David J.B.*, 2010 WL 2889265, at *8 (Tenn. Ct. App. July 23, 2010). Clearly, five years does not qualify as the "near future" either.

[5]Evidence was also introduced that Mother has no source of income, and she depends on the
(continued...)

Based on the evidence presented at trial, we conclude that clear and convincing evidence exists to terminate Mother's parental rights to Child because Mother's mental condition is presently so impaired and is likely to remain impaired, so that it is unlikely she will be able to assume the care of and responsibility for Child in the near future.

## B. Best Interests of Child

Next we must next determine whether it is in Child's best interests that Mother's parental rights be terminated. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004) (once grounds for termination have been established, petitioner must show by clear and convincing evidence that termination is in child's best interest). "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *Id.* at 194.

The General Assembly has codified certain factors that courts are to consider in ascertaining whether it is in a child's best interest to terminate a parent's rights:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

---

[5](...continued)
generosity of others to provide her with shelter and spending money.

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The petitioner need not prove each enumerated factor before a court can determine that terminating a parent's rights is in the best interest of a child. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The most relevant factor to consider under the circumstances here is whether Mother's mental status would be detrimental to Child or prevent Mother from effectively providing safe and stable care of and supervision over Child.

The trial court determined that the GAL had proved by clear and convincing evidence that termination of Mother's parental rights is in Child's best interest based on the following findings of fact:

1. [Mother's] mental condition is an organic deficit and is not going to change for the better in the future.

2. [Mother] cannot, based upon her mental challenges, effect a lasting adjustment after reasonable efforts by available social agencies [and] lasting adjustment does not reasonably appear possible.

3. [Mother] does not have the ability to provide a physical environment for the child that is safe and secure.

. . . . .

6. The child is placed in a foster home that wishes to adopt the child.

-10-

7. The caseworker and CASA advocate have opined that it is in the child's best interest to establish permanency for the child as soon as possible through adoption and that the child is very bonded with the foster family.

. . . . .

9. The foster family has offered to the mother ongoing positive contact with the child should they adopt her.

The court's findings of fact are supported by the record, and we conclude these facts, together with the evidence discussed above, provide clear and convincing evidence that termination of Mother's parental rights is in Child's best interest.[6] Accordingly, we affirm the trial court's judgment terminating Mother's parental rights to Child.

The other issues Mother raises on appeal concern Child's placement in foster care. At the time of trial, Mother was living with foster parents with whom she had been placed when she was a teenager. A few weeks before the trial Mother filed a motion seeking to change the placement of Child to the home of her foster parents so Mother could spend more time with Child. The record does not indicate that the trial court expressly addressed this motion or that Mother filed any additional papers seeking a ruling on this motion.

When the trial court entered its Final Decree of Guardianship terminating Mother's rights to Child, the court impliedly denied Mother's motion seeking a change of placement for Child. Mother presented no evidence at trial suggesting Child's current placement is inappropriate or harmful to Child. We believe the court did not err in failing to grant Mother's motion to change Child's placement prior to trial.

Mother's final argument is that DCS did not use reasonable efforts to determine where Child should be placed in the event Mother's parental rights are terminated. This issue is not before the court in this appeal, because the trial court's ruling was limited to whether or not Mother's parental rights should be terminated and did not address Child's future placement with a foster family or as an adopted child. Moreover, now that we have affirmed the trial court's ruling terminating Mother's rights to Child, Mother has no standing to challenge the decision by DCS as to the most appropriate placement for Child.

## V. CONCLUSION

[6]The trial court also noted that Child is currently living with a foster family with whom she has bonded, and that the foster family is interested in adopting her. The foster mother testified at trial that if she were permitted to adopt Child, she would encourage Mother to continue to spend time with Child.

-11-

We affirm the trial court's ruling terminating Mother's parental rights to Child. Costs of this appeal are taxed to the Department of Children's Services.


_____
PATRICIA J. COTTRELL, JUDGE